UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 10-CR-30008-MAP |
| | ) | |
| v. | ) | LEAVE TO FILE GRANTED ON |
| | ) | DECEMBER 14, 2010 |
| MANI M. BATCHU, | ) | |
| also known as "Mark Taylor," | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS STATEMENTS AND OTHER EVIDENCE

The United States of America, by Carmen M. Ortiz, United States Attorney for the District

of Massachusetts, through the undersigned Assistant U.S. Attorney, hereby submits the

Government's Opposition To Defendant's Motion To Suppress (Document 54) (the "First Motion")

and Motion to Suppress II (Document 56) (the "Second Motion").  The Court should deny both

motions as baseless.

The Court should deny the First Motion's request to suppress post-arrest statements made

on June 9, 2009 and June 10, 2009 to the Chicago Police Department ("CPD"), because each set of

statements was made after Mani M. Batchu ("Batchu") knowingly, intelligently, and voluntarily

waived his Miranda rights.  Similarly, the Court should deny the First Motion's request to suppress

the search of a laptop computer seized by the CPD on June 9, 2009, since the laptop was seized

pursuant to Batchu's valid, written consent and since the government searched the laptop only after

obtaining a federal search warrant.  The Court should reject Batchu's wholly self-serving supporting

Verified Affidavit (Document 55-1), in which Batchu claims that he was never advised of his

Miranda rights and that CPD seized the laptop without his permission, since it is patently false.

1

The Court should deny the Second Motion's request to suppress the search of a second laptop, a flash drive, and a camera seized by the Amherst Police Department ("APD") in Hadley, Massachusetts on August 3, 2009, because the APD lawfully seized these items from Batchu's rental car after his arrest pursuant to their motor vehicle and inventory policies and because the government subsequently obtained independent search warrants for each of these items.

1.    The Indictment

The Indictment charges Batchu with the following crimes, all in connection with his persistent sexual abuse of a fifteen year-old Massachusetts female:

    a.    one count of Transportation Of A Minor With Intent To Engage In Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a) (Count One);

    b.    three counts of Travel With Intent To Engage In Illicit Sexual Conduct With A Minor in violation of 18 U.S.C. § 2423(b) (Counts Two through Four);

    c.    one count of Use of Facility Of Interstate Commerce To Entice Minor To Engage In Criminal Sexual Activity in violation of 18 U.S.C. § 2422(b) (Count Five);

    d.    two counts of Sexual Exploitation Of A Minor in violation of 18 U.S.C. § 2251(a) (Counts Six and Seven); and

    e.    one count of Possessing Material Involving The Sexual Exploitation Of Minors in violation of 18 U.S.C. § 2252(a)(4)(B) (Count Eight).

2.      Factual Background

The government expects that the following facts will be established at the evidentiary hearing on the Motion.

a.      Overview Of Batchu's Offenses

In approximately the fall of 2008, Batchu, who was then a nearly thirty year-old doctor specializing in psychiatry at the University of Illinois at Chicago, began courting a fifteen year-old minor female living in Massachusetts ("Minor A"), whom he had met online.  Using the false name of "Mark Taylor," a false age, and a false photograph, Batchu relentlessly groomed Minor A for sex through a lengthy series of e-mails, instant messages, phone calls, gifts, and cards.  Batchu then proceeded to commit the following series of statutory rapes of Minor A:

i.      May 1-2, 2009 in Windsor Locks, CT (in which Batchu transported Minor A from Massachusetts to Connecticut), alleged in Counts One and Two;

ii.     May 23, 2009 in Amherst, MA (which occurred after Minor A had informed Batchu that her mother had reported the earlier episode to the police), alleged in Count Three;

iii.    July 22-25, 2009, in Sebastian, FL and Vero Beach, FL (which occurred not only after Batchu was served with two Massachusetts restraining orders prohibiting contact with Minor A, but also after he was arrested and arraigned in two state statutory rape cases in Massachusetts and Connecticut based on the two May episodes, and released on the condition that he not contact Minor A), the planning of which is included in Count Five.

iv.     August 3, 2009, in Hadley, MA (which occurred the day before Batchu was

3

scheduled to appear in court in the Connecticut case), alleged in Count Four.

In addition to his contact offenses, Batchu also surreptitiously recorded his cybersex sessions with Minor A on the first laptop seized in Chicago, IL (which he also used to access or possess numerous other digital videos and images of child pornography) and on the flash drive seized in Hadley, MA (alleged in Counts Six through Eight). Similarly, he also used the second laptop seized in Hadley, MA to access or possess other digital images of child pornography.

    b.    <u>The First Rape in Windsor Locks, CT on May 1, 2009</u>

According to Minor A, Batchu initially claimed to be a nineteen year-old white man, later sent her a genuine photograph of himself but claimed to be only twenty-one years old, and always insisted his name was "Mark Taylor."[1]  Minor A first met Batchu in person on May 1, 2009.  He flew into Bradley International Airport (located in Windsor Locks, CT), picked her up near her home in Massachusetts, and drove her to a Ramada hotel near the airport.  At the hotel, Batchu engaged in various sexual acts with her.  On Saturday, Batchu drove her back to her Massachusetts home.  Minor A's account of Batchu's sexual misconduct is corroborated by his post-arrest admissions on June 10, 2009, as well as by various business records, including records from his online booking agent, the Ramada, and rental car.

On May 6, 2009, Minor A's mother took her to the APD to report that Minor A had lied about her whereabouts on May 1-2, 2009.[2]  According to Minor A, she then told Batchu that her

---

[1]    According to Minor A, she too initially lied about her age and told Batchu she was eighteen years old, but later said her real age was fifteen years old.  In response, he said that he did not care about her real age because he loved her.

[2]    Minor A initially provided false statements to her family and the APD concerning her relationship with Batchu, including a denial of this sexual conduct.

mother had gone to the police and Batchu responded, in sum and substance, that he did not care and that nothing would come between them.

      c.     <u>The Second Rape In Amherst, MA on May 23, 2009</u>

According to Minor A, on or about May 23, 2009, Batchu drove from Illinois in a silver Lexus, rented a room at a hotel in Hadley, MA, and then met Minor A in a park near her home, where they engaged in sexual conduct.  Batchu's presence in Massachusetts is corroborated by Batchu's post-arrest admissions on June 10, 2009, as well as by records of the Economy Lodge in Hadley.[3]

      d.     <u>Batchu's Receipt Of Two Protective Orders</u>

On May 24, 2009, the Eastern Hampshire County District Court in Massachusetts issued a temporary restraining order that ordered Batchu to have no contact with Minor A (the "TRO").  Later that day, Officer Paul Jimenez from the Glendale Heights, IL Police Department served the TRO on Batchu, who accepted service.

On May 26, 2009, the Eastern Hampshire County District Court issued a permanent restraining order that ordered Batchu to have no contact with Minor A for one year (the "PRO").  On May 29, 2009, CPD Dets. Robert Clemens and Rita O'Leary served the PRO on Batchu at a hospital where he worked as a second-year medical resident in psychiatry.  Batchu accepted service and asked how long it was in effect.

According to records provided by the University of Illinois at Chicago, on June 5, 2009, Batchu met with his residency director, Robert W. Marvin, M.D., to discuss the PRO.  Batchu

---

[3]     Minor A initially provided law enforcement with various false statements of her relationship with Batchu, including a denial of this sexual conduct.

admitted to Marvin that he began an online relationship with a fifteen year-old girl but (falsely) told Marvin that: (1) once he found out her age, he stopped contact; and (2) he did not plan to pursue the relationship.  To the contrary, Batchu soon thereafter violated the PRO (as well as two state criminal pre-trial release orders) by surreptitiously engaging in repeated contact, including sexual contact, with Minor A.

       e.      <u>Batchu's June 9, 2009 Arrest In Chicago, His Post-Arrest Admissions,<br>And His Consent To Seize And Search The First MacBook Computer</u>

On June 8, 2009, the Eastern Hampshire District Court issued an arrest warrant for Batchu based upon a complaint that alleged one violation of Massachusetts General Laws Chapter 265, Section 23 - namely, that on May 23, 2009, Batchu unlawfully had sexual intercourse or unnatural sexual intercourse with, and abused, a child under 16 years of age.

On the afternoon of June 9, 2009, CPD Dets. Rita O'Leary and Joan Burke met Batchu at the hospital to execute the Massachusetts arrest warrant.  In order to avoid embarrassing Batchu, the CPD detectives asked him to step into the hallway, where they informed him of the Massachusetts arrest warrant, advised him of the charge, and placed him under arrest.  Pursuant to their standard procedure, the CPD detectives orally advised Batchu of his <u>Miranda</u> rights upon his arrest, and Batchu stated that he understood these rights.  The detectives did not interrogate Batchu, and escorted him out of the hospital building to their car.

At the police car, Batchu asked the detectives to escort him to another medical office, where he said he wanted to pick up a bag and various papers containing confidential information relating to his patients.  Batchu did not want to enter his office in handcuffs, so he asked the detectives to obtain these items, and he executed a CPD Consent To Search form to allow the detectives to

retrieve the items.  Batchu gave Det. O'Leary his office key and explained where she could find his bag and office papers.  Det. O'Leary then retrieved the bag and miscellaneous office papers, while Det. Burke remained in the car with Batchu.  In the car, Batchu and Det. Burke engaged in small talk unrelated to the case while they waited for Det. O'Leary.

When Det. O'Leary returned to the car with the bag and office papers, she asked Batchu if the bag contained his computer, and Batchu said that his laptop computer was at his home.  Batchu offered to provide the laptop to the detectives if the detectives would allow him to drop off the bag and office papers at his home, and the detectives agreed to do so.  Outside Batchu's apartment building in downtown Chicago, Batchu executed another Consent To Search form to allow the detectives to retrieve the laptop, and then he accompanied the detectives into his apartment.  Inside the apartment, the detectives dropped off Batchu's bag and office papers, and Batchu located his laptop, an Apple MacBook Pro (the "First MacBook"), which the detectives retrieved.  The detectives did not search Batchu's apartment building, and instead simply departed with Batchu and his laptop.  The detectives also never searched the bag nor reviewed the office papers, since they believed Batchu's explanation that these items contained his patients' confidential information.

During the drive back to the police station, Batchu and the officers engaged in general conversation.  During this conversation, Batchu volunteered that he had met Minor A on an Internet speed-dating service, he had traveled to Massachusetts to meet her, and she was the first caucasian girl that he had been with.  At the police station, the detectives conducted a custodial search of Batchu's wallet, and discovered a photograph of a young girl.  The detectives asked Batchu who was depicted, and he replied with the first name of Minor A.

On the morning of June 10, 2009, at the suggestion of Assistant U.S. Attorney Steven H.

Breslow, Dets. O'Leary and Burke conducted a formal interview of Batchu in a holding cell prior

to his Chicago arraignment.  The detectives first orally advised Batchu of his <u>Miranda</u> rights, which

he orally waived.  Batchu then stated that:

    i.        He met Minor A in October 2008 on a computer speed-dating service.

    ii.       He used both the First MacBook and his cell phone to communicate with Minor A.

    iii.     When communicating with Minor A with both the computer and the cell phone, they would engage in cybersex, which he described as telling each other about sex acts that they would engage in with each other.

    iv.     Minor A's Internet posting listed her age as 18 years old, and Minor A told him that she was in high school and had a learning disability.

    v.       Minor A knows him as "Mark Taylor," which he likes better than his real name.  He never told Minor A his real name or age.

    vi.     He twice traveled to meet Minor A.

    vii.    The first time he met Minor A, he traveled by plane.  He left on a Friday and returned on a Sunday, and stayed at a Ramada hotel in Hartford at the Bradley Center.  Minor A spent Friday night with him at the hotel, and he drove her back home on Saturday.  At the hotel, he performed oral sex on her, placed his fingers in her vagina, and attempted to have sexual intercourse.  However, his penis went limp, which he believed was due to a vein that restricted blood flow to his penis.

    viii.   The second time he met Minor A, they went to a hill by her house, where they

held hands and kissed.

Batchu never invoked his rights to remain silent or to counsel; he appeared calm and cooperative throughout his encounters with the detectives; and he appeared to understand his Miranda rights fully and clearly. The detectives never threatened Batchu, nor did they provide him any promises, rewards, or inducements for speaking with them or consenting to the searches.

      f.    Batchu's Violation Of His State Criminal Pre-Trial Release Conditions

On June 24, 2009, Batchu initially appeared in the Eastern Hampshire District Court in Commonwealth of Massachusetts v. Mani Batchu, Docket No. 0998CR001409. The Court ordered Batchu released on $10,000.00 cash bail, with the conditions that Batchu "refrain from abuse of," "stay away from," and "have no contact with" Minor A. The Court further ordered that Batchu be taken by counsel to the Windsor Locks, CT Police Department, where he faced charges relating to his rape of Minor A in the airport Ramada.

On June 25, 2009, Batchu initially appeared in Connecticut Superior Court (GA-13 Enfield) in State of Connecticut v. Mani M. Batchu, where he was charged with sexual assault in the second degree, in violation of C.G.S. § 53a-71, in connection with his May 1, 2009 misconduct. The Court released Batchu on a $10,000.00 cash bond with the condition that he have "no contact w/ any child under age 18." The Court also issued a Protective Order that directed, until disposition of Batchu's criminal case or further order of the Court, that Batchu refrain from: (a) having any contact in any manner with Minor A, (b) coming within 100 yards of Minor A, and (c) sexually assaulting Minor A.

As set forth below, Batchu deceived both state courts, since he never intended to forgo contact with Minor A. Instead, he soon thereafter violated both the Massachusetts and Connecticut

9

release conditions by surreptitiously engaging in repeated contact, including sexual contact, with Minor A.  <u>Infra</u> at 11-13.

        g.      <u>The Search Of Batchu's First MacBook</u>

On July 1, 2009, United States Magistrate Judge Michael T. Mason in the Northern District of Illinois authorized a warrant to search Batchu's First MacBook, which he had consensually provided to the detectives at his home on June 9, 2009.  Notably, the affidavit did not contain any of Batchu's post-arrest statements which are now the subject of the First Motion to suppress.

The FBI conducted an initial forensic examination and found that the First MacBook contained, among other items: (a) a photo of Minor A; (b) an audio file called "I Swear (Boo Boo Bear).mp3," which records Batchu singing a song addressed to Minor A, in which he references their sexual contacts; (c) a web search for hotels in the Northampton/Amherst area; and (d) numerous files indicating web searches with search terms indicative of child pornography (*e.g.*, preteen, lolita, kiddy, and pthc). The initial forensic examination, however, did not recover any child pornography.

On October 03, 2009, the government moved for a ninety-day extension to search the First MacBook, explaining that the government wanted to search the "free space" of the laptop for files that may have been deleted or erased.  On November 2, 2009, Magistrate Judge Mason authorized the extension.  The FBI subsequently conducted a second forensic examination and recovered from unallocated space: (a) hundreds video files depicting minor females, including Minor A, engaged in sexually explicit conduct such as displaying their genitals or masturbating; (b) hundreds of image files depicting minor females, mostly adolescents, engaged in sexually explicit conduct such as displaying their genitals or masturbating; (c) an untitled two-page essay that indicates the author

(Minor A) was fifteen years old at the time of the essay;[4] and (d) a transcript of the "I Swear (Boo Boo Bear)" song that indicates that it was written by "Mark Taylor" on April 1, 2009.

      h.    <u>Batchu's Third Rape Of Minor A</u>

On July 22, 2009, Minor A traveled with her family to Vero Beach, FL for a vacation, in part to seek a respite from the ordeal caused by Batchu's two May trips.  According to Minor A, Batchu surreptitiously visited her during this vacation for the purpose of having sex with her, in clear contravention of the PRO and the two state pre-trial release orders.  On the final day of this liaison, Batchu told Minor A that she could refuse to testify against him and that if anyone ever asked, she should deny having sex with him.[5]  Minor A's account of Batchu's presence in Florida is corroborated by various business records, including Batchu's online booking agent, airline, hotel, and rental car records.

      i.    <u>Batchu's Fourth Rape Of Minor A And The Seizure Of<br>Batchu's Second MacBook, Flash Drive and Camera</u>

On August 4, 2009, Batchu was scheduled to appear in Connecticut Superior Court for a proceeding in his criminal case.  According to Batchu's airline, rental car, and hotel records, on the morning of August 3, 2009, Batchu flew from Chicago to Bradley International Airport, where he rented a 2010 red Ford Mustang sports car.

Later that day, Minor A and her sister went to see a movie at a theater located in the Hampshire Mall in Hadley, MA.  Shortly after the movie began, Minor A excused herself to use the restroom.  After Minor A failed to return to the theater, her sister called their mother, who promptly

---

[4]      According to Minor A, this essay was a school project that she had e-mailed to Batchu, who had assisted her in editing the essay.

[5]      Minor A did not initially inform law enforcement of the Florida episode.

informed the Hadley Police Department (the "HPD"), the APD, and the FBI that Minor A was missing and was feared to be with Batchu.

Soon thereafter, HPD Officer Damion P. Shanley located Batchu in the vicinity of the mall's food court, within approximately fifty feet of Minor A.  Batchu explained to the HPD that he was in the area for a Connecticut court case and (falsely) claimed that he had traveled to the mall so that he could eat at Fuji Chen, a fast-food restaurant in the mall's food court.  When Officer Shanley asked Batchu about PRO, Batchu (falsely) claimed that he saw Minor A but he ignored her and looked away.  Officer Shanley then arrested Batchu for violating the PRO.

After Batchu's arrest, the HPD requested APD's assistance with arranging a police tow of Batchu's vehicle by a nearby private facility.[6]  APD officers searched the mall parking lot for the silver Lexus that Batchu had previously driven to Massachusetts, but did not locate this vehicle.

Members of the HPD transported Batchu to the HPD for booking and processing.  At the HPD, Officer Shanley orally advised Batchu of his Miranda rights.  Soon thereafter, APD Det. Richard Maclean arrived at the HPD and confirmed with Officer Shanley that Batchu had been advised of his rights.  Batchu then agreed to speak with Det. Maclean and told him, among other things, that he had rented a red Ford Mustang (the "red Mustang").

Det. Maclean informed APD officers at the mall that Batchu was driving the red Mustang.

---

[6]     Pursuant to a Mutual Aid Agreement executed by the towns of Amherst, MA and Hadley, MA on March 7, 2002 (the "MAA"), the APD and HPD "may request mutual aid assistance for any law enforcement situation occurring within municipal boundaries of said member community, if said situation requires the use of resources not immediately available to the local law enforcement agency."  MAA § 3.0.  "Police officers from a sending community shall have all the powers of police officers, including the powers of arrest, while responding to a mutual aid request as provided by Massachusetts General Laws, Chapter 41, Section 99."  MAA § 5.0.

APD Sgt. Brian Daly and two other officers subsequently located the red Mustang in the mall's

parking lot.  The APD officers then requested a tow from a private company, and conducted an

inventory search of red Mustang's contents pursuant to their policies.[7]  During the inventory search,

the APD located, among other items, a Garmin GPS device, a laptop bag containing an Apple

MacBook Pro (the "Second MacBook"), and a Casio digital camera (the "Camera").  Later that day,

the APD provided these items to the HPD.

On or about August 5, 2009, HPD Officer Shanley transferred the seized items back to the

APD.  Consistent with the inventory search, in an Incident Report, the APD subsequently listed the

status of the Garmin, laptop bag and contents, and Camera as "Held for Safe Keeping."[8]  After the

---

[7]      APD Policy and Procedure § 31 (Motor Vehicle Tow and Inventory) provides in
pertinent part:
         "Amherst Police Officers may order a vehicle tow when the operator is arrested
and the owner of the vehicle is not present."  § 31.I.B.
         "INVENTORY: Vehicle Subject To Inventory: A.  Any vehicle that is towed,
removed, impounded, or stored at the direction of a police officer, or is placed in the custody of
the Amherst Police Department is to be inspected and inventoried."  § 31.IV.A.

         APD Policy and Procedure § 77 (Search and Seizure) provides in pertinent part:
"MOTOR VEHICLE INVENTORY: If the vehicle is impounded, the vehicle shall be searched
and all personal property found in the vehicle be inventoried and kept in safe custody in
accordance with the departmental policy on Motor Vehicle Inventories."  § 77.III.B.6.c.vii.

         HPD's Motor Vehicle Policy provides in pertinent part: "It shall be the policy of
the Hadley Police Department to conduct and record an inventory of the contents of vehicles,
towed, removed, or stored at the Police Department as the result of police action. . . . Whenever,
because of the incarceration, incapacity, or unavailability of the operator/owner of a motor
vehicle, members of the Hadley Police Dept. causing same to be towed, removed, or stored, shall
assume a responsibility for safeguarding the contents of the vehicle for the operator/owner."  § 1
and Procedure (1).

[8]      The APD listed the Second MacBook as "Seized (Not Previously Stolen)."  The
APD apparently did not complete a Motor Vehicle Report Inventory form, although such a form
is listed as part of the APD's Inventory Process.  APD Policy and Procedure § 77.IV.C.4.

HPD transferred the seized items back to the APD, the APD discovered a SanDisk flash memory drive (the "Flash Drive") in a side-pocket of the laptop bag.

According to Minor A, Batchu had told her to stay in the movie for thirty minutes, leave, and meet him at the food court.  Soon after the movie began, she left the theater and met Batchu at the mall, and they went to a nearby department store, where they engaged in sexual conduct.[9]

j.     The Searches of Batchu's Second MacBook, Flash Drive, and Camera

On or about August 3, 2009, APD Det. Christina Knightly informed FBI Special Agent Andrew Litowitz that the APD had arrested Batchu, conducted an inventory search of his vehicle, and seized the Second MacBook.  SA Litowitz conveyed this information to Assistant U.S. Attorney Steven H. Breslow, who informed SA Litowitz that he wanted to obtain a federal search warrant for the Second MacBook.  SA Litowitz conveyed this request to APD Det. Christina Knightly, who indicated that the APD would obtain a state search warrant for the Second MacBook.  Ultimately, AUSA Breslow, SA Litowitz, and Det. Knightly agreed that the APD would obtain a state search warrant for the Second MacBook.  At the time of this decision, neither AUSA Breslow nor SA Litowitz was aware that the messenger bag also contained the Flash Drive.  On August 5, 2009, to assist the APD in their efforts to obtain a state search warrant for the Second MacBook, SA Litowitz prepared a two-page outline of pertinent facts and faxed this outline to Det. Knightly.  Although AUSA Breslow and SA Litowitz assumed that the APD would seek this state search warrant, the APD did not do so, nor did the APD ever search the Second MacBook.

On or about August 9, 2009, an APD detective, without a search warrant or consent from

---

[9]     Minor A initially provided law enforcement with a false denial of this sexual conduct.

Batchu, examined all of the files on the Flash Drive that appeared to him to be image or video files, including several video files that depicted Batchu and Minor A engaged in cybersex sessions. Within the next several weeks, several other members of the APD, also without a search warrant or consent from Batchu, separately viewed several of these cybersex files.  At the time of these searches, neither AUSA Breslow nor SA Litowitz knew that the Flash Drive existed or had been searched by the APD without a warrant or consent.  After the APD informed SA Litowitz that the Flash Drive existed and had been searched without a warrant or consent and that the APD had not yet obtained a state warrant to search the Second MacBook, SA Litowitz and AUSA Breslow decided to seek federal search warrants for the Flash Drive, Second MacBook, and the Camera.

On November 13, 2009, Magistrate Judge Kenneth P. Neiman authorized search warrants for the Second MacBook and the Flash Drive to search for evidence relating to contacts between Batchu and Minor A.  United States v. John Doe, 09-MJ-727-KPN.  Notably, SA Litowitz's affidavit in support of the search warrants informed the Court that the APD had searched the Flash Drive without a warrant or consent and further stated:

> Although I am generally aware of the nature of these several files, I have not reviewed the Subject Flash Drive, nor am I relying on any of the previously viewed files in the Subject Flash Drive as part of the probable cause for the requested warrants.  I am only providing information relating to these searches so that the Court is aware that they took place in the circumstances as described.

Affidavit, ¶ 91, n.14.

On December 7, 2009, the FBI conducted a forensic examination of the Flash Drive, which revealed five video files that appear to be screen captures of a webcam chat between Batchu and Minor A, in which Minor A and/or Batchu are engaged in sexually explicit conduct.  Two files were

found in a "Trashes" folder on the Flash Drive and have last access dates of July 18, 2009 (i.e., approximately two weeks prior to the seizure of the Flash Drive), suggesting that they were <u>not</u> viewed by the APD during the warrantless/consentless searches of the Flash Drive.  Three other files that were not located on in the "Trashes" folder have last access dates of August 28, 2009, suggesting that they were last viewed by the APD on or about August 28, 2009.

According to the FBI's forensic examination of the Second MacBook, the computer contained photographs of Batchu and Minor A together at a beach location in what appears to be Florida.

On or about May 6, 2010, Magistrate Judge Neiman authorized additional search warrants for the Second MacBook and the Flash Drive to search for evidence relating to child pornography. <u>United States v. John Doe</u>, 09-MJ-727-KPN.  SA Litowitz's affidavit in support of the search warrants incorporated his November 13, 2009 affidavit and provided no further information concerning the APD's prior searches of the Flash Drive.  The FBI conducted another forensic examination of the Second MacBook and the Flash Drive and recovered from both devices numerous images of child pornography.

On or about June 18, 2010, Magistrate Judge Neiman authorized a search warrant for the Camera.  <u>United States v. John Doe</u>, 09-MJ-727-KPN.  SA Litowitz's affidavit in support of the search warrant incorporated his prior affidavits and provided no further information concerning the APD's prior searches of the Flash Drive.

3.      <u>The Motions Should Be Denied</u>

Faced with Batchu's detailed confession and with overwhelming digital evidence in the First MacBook, Batchu attempts to: (a) suppress his statements by claiming that he was not advised of his

rights to remain silent and his right to counsel; and (b) suppress the search of the First MacBook by claiming that he did not knowingly, intelligently, or voluntarily consent to the search.  Verified Affidavit; First Motion.  The First Motion should be denied because the CPD twice informed Batchu of his Miranda rights, Batchu executed a valid, written consent to search the First MacBook, and the government subsequently obtained a search warrant for the First MacBook.

Similarly, confronted with overwhelming digital evidence in the Second MacBook and the Flash Drive, the defense attempts to suppress the search of these items by claiming that: (a) the items were improperly seized from Batchu's rental car by local law enforcement; (b) the items were illegally searched by local law enforcement; and (c) the ensuing federal search warrant was obtained as a result of the illegally obtained information.  Second Motion.[10]  The Second Motion should be denied since the Second MacBook, Flash Drive, and Camera were properly seized pursuant to the APD's towing and inventory policies and the subsequent federal search warrants provided an independent, untainted means to obtain the evidence.

       a.     Batchu's Confession Was Voluntary, Knowing, And Intelligent

          i.     Legal Standard

A defendant may waive the rights conveyed in the Miranda warnings "provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444 (1966). A Miranda waiver is done voluntarily if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U. S. 412, 421 (1986). The waiver

---

[10]     The Second Motion is replete with factual errors.  First, Batchu was arrested on August 3, 2009, not August 6, 2009.  Second, Batchu was arrested by the HPD, not Connecticut law enforcement.  Third, the Second MacBook and Flash Drive were seized by the APD, not Connecticut Law Enforcement.  Fourth, there was no warrantless search of the Second MacBook by Connecticut law enforcement or, for that matter, any law enforcement agency.

is done knowingly and intelligently if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

Courts look to the totality of the circumstances, including the details of the interrogation and the characteristics of the accused, to determine if a Miranda waiver is the result of "an uncoerced choice" and of "the requisite level of comprehension." Id.

"An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)).  The Supreme Court has also noted that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 444 (2000) (quoting Berkemer v. McCarty, 468 U.S. 420, 433, n.20 (1984)).

A confession is voluntary unless it results from "coercive police activity." Colorado v. Connelly, 479 U.S. 157, 166, 167 (1986).  In other words, "'[O]nly confessions procured by coercive official tactics should be excluded as involuntary.'  To find that officials used coercive tactics, the facts must 'add up to police overreaching.'" United States v. Daubmann, 474 F. Supp. 2d 228, 235 (D. Mass. 2007) (citations omitted).

The government bears the burden of establishing, by a preponderance of the evidence, the validity of a Miranda waiver and the voluntariness of a subsequent confession.  Connelly, 479 U.S. at 168; Lego v. Twomey, 404 U.S. 477, 489 (1972).

     ii.    Batchu's *Miranda* Waiver Was Voluntary, Knowing, And Intelligent

Faced with a detailed and comprehensive confession, Batchu simply claims that the CPD detectives never informed him of his <u>Miranda</u> rights and that, in responding to their questions, "I merely acquiesced to the officers [sic] authority." Affidavit, ¶¶ 3-6. Notably, Batchu does not even assert that the officers engaged in intimidation, coercion, or deception whatsoever. Contrary to Batchu's claim, the detectives twice advised Batchu of his <u>Miranda</u> rights - first upon his arrest on June 9, 2009, and then before his interview on June 10, 2009.

The Court should reject as patently false Batchu's claim that the CPD did not advise him of his rights. First, Batchu's claim should be viewed with skepticism because it is entirely self-serving; Batchu clearly has an incentive to lie in an attempt to win suppression of obviously devastating evidence. By contrast, the detectives (who were simply executing another state's warrant for a individual in their jurisdiction) had no such incentive to gain a confession at all costs.

Second, the detectives' account is corroborated by the fact that shortly before his <u>Miranda</u> waiver, Batchu executed two separate written Consent To Search forms (one for his messenger bag and papers and another for the First MacBook), each of which stated in pertinent part that:

> I . . . have been advised of my constitutional right not to have a search made of the premises / vehicle described below without a search warrant first being obtained. I have also been advised that I do not have to consent to this warrantless search unless I wish to do so.
>
> Having been advised that I do not have to consent to a warrantless search, I hereby authorize and give my consent . . . to conduct a complete search of the premises/vehicle under my lawful control.
>
> . . . . I hereby authorize and give my consent to the above-named officers to obtain and removed from the searched premises/vehicle any materials, documents, or other items that may be used in connection with a legitimate law enforcement purpose.
>
> . . . . I hereby state and certify that this consent to search is being

> given by me to the above-named officers knowingly, voluntarily, and
> without having received any threats, promises or duress of any kind.

CPD Consent To Search Form 11.483.  Since Batchu twice acknowledged in a writing that his

consent to search was knowing and voluntary, the Court should credit the detectives' testimony that

he orally waived his Miranda rights soon thereafter.

Third, after his arrest on August 3, 2009 in Hadley, MA, Batchu again orally waived his

Miranda rights and agreed to speak to APD Det. Maclean.  This Miranda waiver tends to support the

detectives' account that approximately two months earlier, he did the same – particularly since

Batchu's waiver in Hadley took place after Batchu was twice arraigned (and presumably advised of

his consitutional rights) in the Massachusetts and Connecticut state court cases.

Fourth, Batchu engaged in a broad pattern of deception and falsity relating to these crimes

both before and after the events of June 9-10, 2009: (a) he repeatedly lied to Minor A about his

identity, including his likeness, name and age; (b) he lied to his residency director about his

relationship with Minor A and his intention to terminate contact; (c) he falsely pledged to the

Massachusetts and Connecticut state courts that he would not contact Minor A, when he fully

intended to - and did - remain in surreptitious contact with her; (d) he attempted to persuade Minor

A to lie to law enforcement about their relationship; and (e) when confronted by HPD Officer

Shanley in the Hadley mall food court, he concocted a false explanation for his presence there and

falsely claimed to have ignored Minor A when he saw her.  Batchu's repeated falsehoods undermine

the credibility of his instant claims to this Court.

Batchu's age, experience, intelligence, and prior contacts with law enforcement also

demonstrate that his Miranda waiver was knowing, intelligent, and voluntary.  At the time of his

interview, Batchu was 30 years old, was highly educated, and was working as a medical resident in psychiatry. Although Batchu had no prior arrests, he had already received two prior restraining orders and thus was familiar with police interest in his relationship with Minor A and, moreover, had previously met CPD Det. O'Leary when she served the PRO.

Further, there are "certain types of cases in which courts routinely conclude that a defendant who has professed an understanding of his right to remain silent has waived that right." Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999). Specifically, "if a defendant's incriminating statements were made either as part of a 'steady stream' of speech, Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990), or as part of a back-and-forth conversation with the police, Baskin v. Clark, 956 F.2d 142, 146 (7th Cir. 1992), courts regularly have found waivers." Bui, 170 F.3d at 240. The government expects that the evidence at the hearing will establish that Batchu's interview on June 10, 2009 was exactly the sort of conversation in which courts have found a waiver.

"Oral waivers of Miranda rights are sufficient . . . ." United States v. Guzman, 603 F.3d 99, 106-07 (1st Cir. 2010) (noting that "Guzman was told his rights and he confirmed that he understood them . . . ."). Here, Batchu was told his rights, he confirmed that he understood them, and he agreed to speak with the CPD on two separate occasions. Consequently, the Court should not suppress his admissions.

        b.    The CPD Validly Seized, And The Government Lawfully Searched, Batchu's First MacBook

           i.    Legal Standard

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. However, it is well settled that "one of the specifically established

exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  The consent may be express or inferred from conduct.  United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006).

"In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily.  The assessment of whether consent is free and voluntary is a question of fact that requires an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party.  The district court's factual findings relating to the validity of the consent are reviewed for clear error." United States v. Jones, 523 F.3d 31, 37 (1st Cir.2008).

In considering the totality of the circumstances, the Court should take into account the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent; whether the consenting party was advised of his constitutional rights; and whether permission to search was obtained by coercive means or under inherently coercive circumstances. United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999).  The consenting party need not be informed of the right to withhold consent, although knowledge of this right is a factor to be considered. Schneckloth, 412 U.S. at 227.

The fact that a defendant is in custody or has been arrested does not preclude a voluntary consent. United States v. Watson, 423 U.S. 411, 424-45 (1976) (holding that defendant voluntarily consented to search even though he had been arrested and was in custody); Jones, 523 F.3d at 38 (affirming a finding that consent was voluntary even though approximately ten to fifteen agents with guns drawn entered his hotel suite without knocking, handcuffed him, placed him in a separate room,

proceeded to interrogate him, and did not advise him of his right to withhold consent).

"Despite the obvious irony, it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." United States v. Price, 599 F.2d 494, 503 (2d Cir. 1979).  As the First Circuit has explained, "the incriminating contents of the room do not necessarily belie consent:  'A defendant may believe that (a) search is ultimately inevitable whether he consents or not.  In such circumstances a suspect might well feel he is better off to consent than to oppose.'" United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976) (quoting Leavitt v. Howard, 462 F.2d 992, 997 (1st Cir. 1972)).  Further, a consent search "may result in considerably less inconvenience for the subject of the search." Scheckloth, 412 U.S. at 228.

The scope of a consent to search is based upon what a reasonable person would have understood based upon the conversation between the police and the consenting individual.  See Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) (stating that "[t]he scope of a search is generally defined by its expressed object.").

        ii.      The CPD Validly Obtained Batchu's Consent To Seize His First MacBook

Shortly after his arrest on June 9, 2009, Batchu volunteered to provide the First MacBook to the CPD detectives, and prior to their entry into his apartment, he memorialized this consent in written form.  The Consent To Search forms explicitly stated that Batchu was advised that he did not have to consent to a warrantless search, that he nonetheless consented to the search, and that his consent was being given "knowingly, voluntarily, and without having received any threats, promises or duress of any kind." Supra, at 19.  The consent form is thus "strong proof of validity of that

waiver.'" <u>Hack</u>, 782 F.2d at 866 (quoting <u>Butler</u>, 441 U.S. at 373). The Court should reject as blatantly false Batchu's self-serving, unsubstantiated assertion that "[a]t no time was my consent done knowingly, intelligently, or voluntarily." Affidavit, ¶ 9.

The mere fact that the CPD had arrested Batchu does not undermine the validity of his consent. In <u>Watson</u>, the Supreme Court held that Watson validly consented to a search of his car even though he had been arrested and the police had failed to inform him that he could withhold consent. 423 U.S. at 425. Indeed, the First Circuit has affirmed the district court's finding of voluntary consent by defendants in much worse circumstances than Batchu's. In <u>Cepulonis</u>, the First Circuit held affirmed the district court's finding that Cepulonis voluntarily consented both to the agents entering his hotel room and searching the room for weapons, even though he was handcuffed and surrounded by agents, two of whom carried shotguns. 530 F.2d at 243-44. In <u>Winston</u>, the First Circuit similarly held that the Winston's in-home arrest did not preclude a voluntary consent, even though agents had forced their way into Winston's home, approached him with weapons drawn, ordered him to drop his cell phone, handcuffed him, and did not read him <u>Miranda</u> warnings. 444 F.3d at 121-22 (finding "no serious question as to whether Winston acted voluntarily . . . ."). <u>See</u> <u>United States v. Kimball</u>, 741 F.2d 471, 472-474 (1st Cir. 1984) (affirming district court's finding of voluntary consent even though officers had surrounded Kimball's cabin with firearms at the ready, and then arrested and handcuffed Kimball, who initially refused to consent to search); <u>United States v. Dunbar</u>, 553 F.3d 48, 57 (1st Cir. 2009) (affirming district court's finding of voluntary consent even though Dunbar's consent was given only after he was removed from his car by a police officer and placed in the back of a police cruiser with a police dog in the compartment behind him).

The remaining circumstances, including Batchu's age, education, and intelligence, all

demonstrate that his consent was valid.

        iii.    The Government Lawfully Searched The First MacBook Pursuant To A Valid
                Federal Search Warrant

Although Batchu's written consent empowered the government to search the First MacBook, the government took the added precautions of: (a) obtaining a federal search warrant for the laptop and (b) eschewing any mention of Batchu's post-arrest admissions in demonstrating its basis for probable cause. Thus, the Court should not suppress the government's search of the First MacBook.

    c.    The Evidence Seized From Batchu's Rental Car Should Not Be Suppressed

        i.    The APD Conducted A Proper Inventory Search Of Batchu's Rental Car

            (1)    Legal Standard

It is well settled that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987); see United States v. Richardson, 515 F.3d 74, 85 (1st Cir. 2008) (stating that "[t]he Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy."); United States v. Hawkins, 279 F.3d 83, 85-86 (1st Cir. 2002) (stating that "[s]uch a standardized inventory policy may be unwritten.").

In Bertine, the Supreme Court found that "inventory procedures serve to protect an owner's property while it is in the custody fo the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Id. at 372 (citing South Dakota v. Opperman, 428 U.S. 364 (1976)). Even if a vehicle is towed to a secure facility, "the security of the storage facility does not completely eliminate the need for inventorying; the police may still wish to protect

themselves or the owners of the lot against false claims of theft or dangerous instrumentalities." Id. at 373.

As the First Circuit has recognized, "[c]aselaw supports the view that where a driver is arrested and there is no one *immediately* on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." Vega-Encarnacion v. United States, 344 F.3d 37, 41 (1st Cir. 2003) (emphasis in original). Moreover, "a search or seizure undertaken pursuant to the community caretaking exception is not infirm merely because it may also have been motivated by a desire to investigate crime." United States v. Coccia, 446 F.3d 233, 240-41 (1st Cir. 2006); see Bertine, 479 U.S. at 372 (stating that there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."). As the Supreme Judicial Court of Masschusetts stated, "[T]aking an inventory of the contents of a car about to be towed or impounded is a reasonable procedure, and the fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of the search should not vitiate his obligation to conduct the inventory." Commonwealth v. Matchett, 386 Mass. 492, 510, 436 N.E.2d 400 (1982) (quotation omitted).

<div align="center">(2)    The APD Properly Searched Batchu's Rental Car</div>

After Batchu's arrest at the Hampshire Mall on August 3, 2009, the APD properly arranged for the towing of Batchu's rental car, consistent with the policies of both the APD and the HPD. Prior to the tow, the APD properly conducted an inventory search of the contents of the car and provided them to the HPD for safekeeping, again consistent with the policies of both the APD and the HPD.

Although the APD apparently did not complete its own Motor Vehicle Report Inventory form, the APD did list in its paperwork many of the items seized as "Held for Safe Keeping" when the items were returned to the APD by the HPD.  In any event, the mere technical failure of an officer to follow inventory procedures does not preclude the finding that the search was an inventory search.  United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986); see United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir. 1985) (rejecting the defendant's contention that an inventory search of a briefcase was invalid because the searching officer did not prepare a complete list of the briefcases's contents); United States v. Loaiza-Marin, 832 F.2d 867, 869 (5th Cir. 1987) (stating that "the agent's failure to complete the inventory forms does not mean that the search was not an inventory search."); United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998) (concluding that officers properly conducted inventory search even though the inventory list started at the scene was not completed as it should have been, since the seized items were listed on an evidence form later); United States v. Mundy, 621 F.3d 283, 293 (3rd Cir. 2010) (stating that "the failure of the investigating officers to complete a Towing Report does not demonstrate that the officers conducted the inventory search as a pretext or in bad faith."); United States v. Cruz-Carrillo, No. Crim. 05-0007CCC, 2006 WL 1134935, at *2 (D.P.R. April 24, 2006) (rejecting defendant's contention that the police did not conduct an inventory search because the officer did not fill out the required form).

The seizure of Batchu's Second MacBook, Flash Drive, and Camera was therefore valid.

ii.    The Government Lawfully Searched Batchu's Flash Drive, Second MacBook, and Camera  Pursuant To Independent Federal Search Warrants

(1)    Legal Standard

The exclusionary rule prohibits the introduction into evidence of tangible materials and knowledge acquired during an unlawful search.  Murray v. United States, 487 U.S. 533, 536 (1988).  However, under the independent source doctrine, "evidence acquired by an untainted search which is identical to . . . evidence unlawfully acquired" is admissible.  Id. at 538 (emphasis omitted).  The government bears the burden of showing, by a preponderance of the evidence, that the search was an independent source of the evidence in question.  United States v. Siciliano, 578 F3d 61, 68 (1st Cir. 2009).

As the First Circuit recently explained, the Murray Court:

> extended the "independent source" doctrine to "evidence that had been observed in plain view at the time of a prior illegal entry," id. at 535.  The Court stated that the question in such circumstances is "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue."  Id. at 542.  That would not be so, the Court explained, "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."  Id.

United States v. Jadlowe, — F.3d. —, No. 08-2449, 2010 WL 4962855, at *4 (1st Cir. Dec. 3, 2010).

To implement Murray, the First Circuit adopted a two-part test in United States v. Dessesaure, 429 F.3d 359, 367-69 (1st Cir. 2005):

> In determining whether evidence discovered in a lawful search pursuant to a warrant may be admissible in the aftermath of an unlawful entry, we consider: (1) whether the search warrant affidavit

> contained sufficient information to support probable cause without any information gleaned from the unlawful search; and (2) whether the decision to seek the warrant was in fact "'independent of the illegal entry,'" i.e., "'whether it would have been sought even if what actually happened had not occurred.'"

Jadlowe, 2010 WL 4962855, at *4 (citations omitted).

As the First Circuit recognized, "[o]ur cases reject as 'too rigid' the requirement that the officers be actively pursuing a warrant at the time of the unlawful entry, United States v. Silvestri, 787 F.2d 736, 746 (1st Cir.1986), and favor instead a "flexible standard" based on "[t]he specific facts of each case . . . ." Jadlowe, 2010 WL 4962855, at *5 (citing United States v. Ford, 22 F.3d 374, 377 (1st Cir. 1994)).  Thus, "'there is no necessary requirement that the warrant application process have already been initiated at the time the illegal search took place.'"  Id. (citing Silvestri, 787 F.2d at 746).

### (2) The Government Has Satisified The *Dessesaure* Test

Here, because the government has met both prongs of the First Circuit's two-part Dessesaure test, the Court should not suppress any evidence retrieved from the Second MacBook, Flash Drive, and Camera.

First, the government's search warrant affidavits for the Second MacBook, Flash Drive, and Camera did not contain any information gleaned from the APD's search of Batchu's Flash Drive. Supra, at 15.  Thus, the warrants are entirely untainted.

Second, the government's decision to seek the warrants was wholly independent of – and in a substantial sense predated - the APD's searches of the Flash Drive.  Indeed, on August 3, 2009, well before the government even learned that the Flash Drive existed, much less that it had been

accessed by the APD, AUSA Breslow informed SA Litowitz that he wanted to obtain a federal search warrant for the Second MacBook.  Further, on August 5, 2009, after it was agreed that the APD would seek a state search warrant for the Second MacBook, SA Litowitz drafted and faxed an outline of facts to assist the APD in obtaining the state warrant.  Thus, the government would have sought warrants for the three items even if the APD had not accessed the Flash Drive's files depicting Batchu's cybersex sessions with Minor A.

4.    Hearing

The government respectfully requests a hearing.  The government anticipates calling the following witnesses (with their approximate duration of direct testimony):

a.    Detective Rita O'Leary, Chicago Police Department (1 hour, 15 minutes);

b.    Detective Joan Burke, Chicago Police Department (1 hour, 15 minutes);

c.    Officer Damion P. Shanley, Hadley Police Department (45 minutes);

d.    Sgt. Brian Daly, Amherst Police Department (45 minutes);

e.    Det. Richard Maclean, Amherst Police Department (45 minutes); and

f.    Special Agent Andrew Litowitz, Federal Bureau of Investigation (2 hours, 30 minutes).

5.    Conclusion

The Court should deny the First Motion's request to suppress post-arrest statements made on June 9, 2009 and June 10, 2009 to the CPD, because each set of statements was made after Batchu knowingly, intelligently, and voluntarily waived his Miranda rights.  Similarly, the Court

should deny the First Motion's request to suppress the search of the First MacBook since the CPD seized the laptop pursuant to Batchu's valid, written consent and since the government searched the laptop only after obtaining a search warrant.

The Court should deny the Second Motion's request to suppress the search of the Second MacBook, Flash Drive, and Camera seized by the APD in Hadley, Massachusetts on August 3, 2009, because the APD lawfully seized these items from Batchu's rental car after his arrest pursuant to their motor vehicle and inventory policies and because the government subsequently obtained independent search warrants for each of these items.

<div style="margin-left: 40%;">

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney


   /s/ Steven H. Breslow   
STEVEN H. BRESLOW
Assistant United States Attorney

</div>

Dated: December 13, 2010

CERTIFICATE OF SERVICE

Hampden,  ss.                          Springfield, Massachusetts
                                       December 13, 2010


       I, Steven H. Breslow, Assistant U.S. Attorney, hereby certify that the foregoing was filed by
ECF and will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing.



                                        /s/ Steven H. Breslow
                                       STEVEN H. BRESLOW
                                       Assistant United States Attorney

32