UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| V. | ) | 10-CR-30008-KPN |
| | ) | |
| | ) | |
| MANI BATCHU | ) | |

## VERIFIED AFFIDAVIT OF RICHARD N. FOLEY

NOW COMES Richard N. Foley, Esq., former counsel for defendant Mani Batchu in the above captioned matter who states as follows:

**Background**

1. I was Counsel for the defendant in this matter and state the following upon personal knowledge and belief.

2. I initially began representing the defendant in April 2010. Between then and sentencing in November 2011 I met with him to discuss his case (including court appearances) on 4/22/10, 5/3/10, 5/8/10, 6/9/10, 6/15/10, 7/9/10, 9/14/10, 9/15/10, 10/15/10, 1/24/11, 1/31/11, 2/24/11, 2/25/11, 3/25/11, 4/4/11, 5/9/11, 9/23/11, 10/30/11 11/17/11, 11/18/11, 12/6/11.

3. I was initially contacted by Imhoff & Associates who are an internet advertising law firm that maintains relationships with

attorneys in various jurisdictions. They paid me a flat fee for representing the defendant before the United States District Court for the District of Massachusetts.

4. Prior to my involvement as counsel the defendant was represented by Attorney Francis Quinn who was involved with representing him in Massachusetts, Connecticut and Florida state courts.

**GROUND ONE**

5. Imhoff & Associates received $5,000.00 from Mr. Batchu for expert expenses which they held. Mr. Batchu and I discussed several times the use of a psychologist/psychiatrist in his defense. I had previously utilized Dr. David Medoff in sex offense cases and think well of his work and recommended him to Mr. Batchu. Dr. Medoff was one of the original panel members of the Massachusetts Sexual Offenders Registry.

6. Mr. Batchu had been told by a fellow inmate that he should retain a Dr. Ablow out of Boston and Mr. Batchu advised me that was who he wished to utilize. I made many attempts to contact Dr. Ablow but I never received a response. See Letter of September 8, 2011 annexed hereto as Attachment A.

7. Dr. Medoff advised me that he needed $8,500.00 up front to do the requisite work and that he was swamped with work and would need at least 45 days to complete his report. The $5,000.00 that Imhoff & Associates possessed was insufficient, so I told Mr. Batchu, when we discussed my September 8, 2011 letter on September 23, 2011, that he

needed the $9,500.00 bail money held by the State of Connecticut to make up the difference. I did not apply for court funds as there was sufficient funds owed Mr. Batchu but due to circumstances beyond my control I could not access them in time to permit Dr. Medoff time to complete his report.

8. On October 6, 2011 the State of Connecticut issued the $9,500.00 return of bail. See photostat of check annexed hereto as Attachment B.

9. Connecticut forwarded the above check to Attorney Quinn who forwarded the same to me. I went to see Mr. Batchu in Central Falls R.I. Detention facility where we discussed the untimeliness of the receipt of the bail money and the need to file a continuance of the sentencing hearing which I promptly filed the next business day as well as placed the bail money in my trust account. See endorsement and posting on back of check in Attachment B.

10. The November 13, 2011 the Motion for Reconsideration erroneously asserts that I had received the bail money on October 6, 2011 rather than that the State of Connecticut had released the monies on that day.

11. At no time did I tell Mr. Batchu that I was being paid '...a minuscule mount of money...'.I did not '...claim(ed) as a fee and converted to (his) own use money that was available and earmarked to retain an expert'

12. At no time did I '...falsely claim(ed) that to Batchu that the Court had denied (their) Suppression Motion'.

13. After the November 18, 2011 sentencing Mr. Batchu and I discussed an appeal. Mr. Batchu did not advise me that he wanted the monies from the bail returned to his family. He asked that I pursue his appeal and agreed to pay me with the bail money as well as the escrowed Imhoff monies.

14. I proceeded to prosecute Mr. Batchu's appeal: filing the notice of appeal within the requisite 10 days; Appearance form; Transcript Report/Order Form; Review file and Identify Issues on Appeal. See letter of December 2, 2011 annexed hereto as Attachment C.

15. On December 1, 2011 Imhoff released $4,800.00 payable to me. See photostat annexed hereto as Attachment D.

16. Imhoff required me to obtain a release from Mr. Batchu of the funds to me which I obtained from Mr. Batchu when I visited him on December 6, 2011 to discuss his appeal and subsequently placed the funds in my trust account on December 9, 2011. Attachment D.

17. At no time did Mr. Batchu mention that he wanted court appointed appellate counsel or the return of monies to his family. When he executed the release of $4,800.00 to me he was in full agreement that it was for my representation of him on his appeal that he insisted go forward.

18. On March 21, 2012 Mr. Batchu advised me that due to finances he wished to have appointed appellate counsel. See Batchu Exhibit A.

19. I followed up on April 23, 2012 concerning the return of unearned fees. See Attachment E annexed hereto.

20. I returned $4,800.00 in unearned fees.

21. I advised him of the briefing schedule. See May 4, 2012 letter annexed hereto as Attachment F.

22. In the absence of successor counsel I continued working on his appeal and once he provided a formal request for court appointed appellate counsel I sought to protect his appeal. See Motion to Hold in Abeyance annexed hereto as Attachment G.

**GROUND TWO**

23. I discussed at length with Mr. Batchu the issues for sentencing. We talked about letters from family and for which I provided a template to be followed. In fact many letters were provided by friends and family to me and which I forwarded to the Court. Inexplicably, the same letter writers sent copies of the letters to the Court which were forwarded to me with the admonition that it was inappropriate to be sent by them to the Judge.

24. It was expected that a psychological evaluation would provide much information to the Court at sentencing but that did not happen.

25. In discussions I advised Mr. Batchu to keep his allocution simple. Mr. Batchu kept wanting to tell the Court that he was in love with the victim and about her dysfunctional environment and I advised him that was not appropriate. I did not advise nor expect him to provide a 'personal' letter to the Court.

26. When I met with Mr. Batchu the day of sentencing he had a lengthy written speech. In it he had proffered a 'moment of silence' at the beginning to which I greatly disagreed. He argued with me

insisting that it would 'impress upon the Court he was human with genuine sympathy towards others'.

27. I reviewed Mr. Batchu's allocution and advised him that during our discussions I had suggested to keep it simple. Mr. Batchu was adamant about the contents of his speech and I suggested following with a question and answer presentation to smooth out Mr. Batchu's soliloquy instead of continuing to argue immediately before the hearing where it was apparent that Mr. Batchu wanted to make his statement.

28. I did not advise Mr. Batchu that I was deliberately ineffective in order to create reversible error on appeal nor that I would file an affidavit claiming ineffectiveness.

29. Mr. Batchu never mentioned court appointed appellate counsel during our discussions after sentencing and later during out meeting on December 6, 2011.

30. During our discussions about his appeal I advised him that in addition to any issues with the case, he had a right to claim ineffectiveness of counsel but it could not be raised on direct appeal, could not be raised by me and that he would have to talk to other counsel concerning that issue.

**GROUND THREE**

31. Mr. Batchu, at the time a Doctor of Osteopathic Medicine and second year resident in Adult Psychology, exhibited no symptoms of mental, social or medical infirmities. Dr. Batchu made no mention of any family, social or cultural issues that were germane to a defense

of his situation. The only fact that he repeatedly asserted was that involvement with underage women in India was OK there.

32. After M. Batchu's change of plea I sent him a profile and financial statement to fill out and return to me prior to his P.S.R meeting. See May 13, 2011 letter annexed hereto as Attachment H.

33. Also contained with the correspondence was AUSA Breslow's STATEMENT OF FACTS that the Government presented for the P.S.R..

34. I met with Mr. Batchu before his interview to discuss the issues and was present for the full interview.

35. Over the course of the case we discussed all possibilities of any mitigating factors and the only one's that Mr. Batchu could come up with that could be corroborated by friends and family members were that he had prior relationships with adult women whom he met on the internet and that he was in love with the victim and that it was a 'mutually romantic relationship'.

36. I fully explored the communications and relationship between the parties and facts pertaining to Mr. Batchu himself including:love letters; video recorded masturbation sessions; many files of internet pornography contained on Mr. Batchu's computers; exchanged tokens of love and all interviews with the victim, police reports and evidence acquired during the police investigation in New England, Florida and Chicago.

37. I found no mitigating circumstances.

38. I was not aware of four (4) videos of internet sex video between Mr. Batchu and a separate woman that were given to the Court, having

viewed only one of that woman and did not realize the objection until after the hearing. The A.U.S.A's transmittal letter was not in the file and I never saw the same. See Petitioner's Exhibit A: email from successor appellate counsel.

39. Not challenging the authenticity of the victim's impact statement was a tactical decision.

40. Not having Mr. Batchu testify at the suppression hearing was a tactical decision.

41. I went over Mr. Batchu's Affidavits with him prior to his execution of them.

42. We discussed at length his plea agreement versus trial and I saw nothing to indicate that his choice to plead guilty was anything other than fully knowing, intelligent and voluntary.

43. When we discussed the possible sentencing range I utilized the sentencing table on the inside of the back cover of the United States Sentencing Commission Guideline Manual.

44. I discussed Mr. Batchu's possible cooperation in seeking a 5K.1 downward departure with AUSA Breslow.

45. AUSA Breslow was not interested in pursuing a 5K.1 departure for Mr. Batchu's assertion that he had knowledge of the victim having sex with other adult males prior to him.

46. I kept Mr. Batchu apprised of all aspects of his case and at no time did I have a conflict of interest of any kind.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY  May 6 , 2015

/s/ Richard N. Foley

_____

Richard N. Foley, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the within VERIFIED AFFIDAVIT OF RICHARD N. FOLEY has been served upon the Government electronically and Mr. Mani Batchu #91057-038 U.S.P. Marion P.O. Box 1000 Marion, IL 62959

_____

Richard N. Foley, Esq.